[16 NE3d 1204, 992 NYS2d 726]

PATRICK LYNCH, as President of the Patrolmen's Benevolent Association of the City of New York, Inc., et al., Respondents, v CITY OF NEW YORK et al., Appellants.

Argued May 8, 2014; decided June 30, 2014

758

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel*, New York City (*Keith M. Snow, Leonard Koerner* and *Paul T. Rephen* of counsel), for appellants. Police officers and firefighters appointed on or after July 1, 2009 are members of tier 3 of the Retirement and Social Security Law. All tier 3 members are required to contribute three percent of their salaries annually

towards their retirement. There is no provision in tier 3 for "Increased-Take-Home-Pay" (ITHP) or any offset of member pension contributions by the employer. The application of ITHP to these tier 3 members would have the effect of making their plans noncontributory, which would be contrary to the legislative intent in creating that tier.

*Dechert LLP*, New York City (*James M. McGuire* and *Edward A. McDonald* of counsel), and *Michael T. Murray, Patrolmen's Benevolent Association of the City of New York, Inc.* (*Allison E. Maue* of counsel), for Patrick Lynch and another, respondents. I. The City of New York has violated its obligations under Retirement and Social Security Law § 480 to tier 3 police officers. (*Pultz v Economakis*, 10 NY3d 542; *Matter of Theroux v Reilly*, 1 NY3d 232; *Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669; *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382; *People v Miller*, 18 NY3d 704; *Eaton v New York City Conciliation & Appeals Bd.*, 56 NY2d 340; *Rapp v Carey*, 44 NY2d 157; *Matter of Broidrick v Lindsay*, 39 NY2d 641; *Matter of Amorosi v South Colonie Ind. Cent. School Dist.*, 9 NY3d 367; *Farrington v Pinckney*, 1 NY2d 74.) II. The City of New York unlawfully converted the wages of tier 3 police officers.

*Seelig Law Offices, LLC*, New York City (*Philip H. Seelig* of counsel), for Roy Richter and another, respondents. The plain language of Retirement and Social Security Law § 480 (b) requires the City of New York to contribute up to five percent toward all police officers' and firefighters' pensions, regardless of tier. The legislature's intent and the history of amendments to Retirement and Social Security Law § 480 (b) demonstrate that "Increased-Take-Home-Pay" applies to all police officers and firefighters. (*Parochial Bus Sys. v Board of Educ. of City of N.Y.*, 60 NY2d 539; *Caminetti v United States*, 242 US 470; *Matter of Theroux v Reilly*, 1 NY3d 232; *Matter of Amorosi v South Colonie Ind. Cent. School Dist.*, 9 NY3d 367; *Brady v Village of Malverne*, 76 AD3d 691.)

*Gleason Dunn Walsh & O'Shea*, Albany (*Ronald G. Dunn* of counsel), for Sergeants Benevolent Association of the City of New York, Inc., amicus curiae. The plain language of Retirement and Social Security Law § 480 dictates that tier 3 police officers be provided the "Increased-Take-Home-Pay" benefit. (*Pultz v Economakis*, 10 NY3d 542; *Matter of Theroux v Reilly*, 1 NY3d 232; *Doctors Council v New York City Employees' Retire-

*ment Sys.*, 71 NY2d 669; *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382; *People v Miller*, 18 NY3d 704; *Eaton v New York City Conciliation & Appeals Bd.*, 56 NY2d 340; *Matter of Amorosi v South Colonie Ind. Cent. School Dist.*, 9 NY3d 367; *People v Grasso*, 42 AD3d 126, 11 NY3d 64.)

· *Certilman Balin Adler & Hyman, LLP*, East Meadow (*Paul S. Linzer* of counsel), for Uniformed Firefighters Association of Greater New York, Local 94, IAFF, AFL-CIO, amicus curiae. I. The clear and unmistakable language of Retirement and Social Security Law § 480 (b) (i) and (ii) mandates that the City of New York must apply the "Increased-Take-Home-Pay" benefit to all uniformed fire and police members, regardless of the pension tier to which they belong. (*Parochial Bus Sys. v Board of Educ. of City of N.Y.*, 60 NY2d 539; *Caminetti v United States*, 242 US 470; *Matter of Theroux v Reilly*, 1 NY3d 232.) II. Legislative action taken subsequent to the codification of "Increased-Take-Home-Pay" further demonstrates the true intent to continue this benefit without restriction. (*Matter of Amorosi v South Colonie Ind. Cent. School Dist.*, 9 NY3d 367; *Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669.) III. The appellants' arguments that "Increased-Take-Home-Pay" (ITHP) does not apply to tier 3 members because ITHP does not have an annuity component, or that tier 3 would be rendered noncontributory, are entirely without merit.

### OPINION OF THE COURT

READ, J.

We are asked on this appeal whether Retirement and Social Security Law § 480 (b) requires the City of New York (the City) to make "Increased-Take-Home-Pay" (ITHP) pension contributions on behalf of New York City police officers and firefighters appointed on or after July 1, 2009. These public employees are tier 3 members of the New York City Police Pension Fund (the PPF) and the New York City Fire Department Pension Fund (the FDPF), respectively. Section 480 (b), enacted in 1974 as part of an omnibus pension clean-up bill (*see* L 1974, ch 510, § 24), was periodically amended thereafter to extend "[a]ny program" otherwise set to expire or terminate in 1974 "under which an employer in a public retirement system funded by the state or one of its political subdivisions assumes all or part of the contribution which would otherwise be made by its employees toward retirement." The tier 5 pension reform legislation, approved by Governor Paterson on December 10, 2009 and ef-

fective 30 days thereafter, made the statute permanent by striking the 2011 expiration dates then in place (*see* L 2009, ch 504, § 1, part A, § 5). ITHP is concededly a "program" within the meaning of section 480 (b).

For the reasons that follow, we conclude that section 480 (b) only encompasses temporary programs in place as of 1974 for tier 1 and 2 members of a public employee retirement system. Stated another way, section 480 (b) does not obligate a public employer to pay any portion of a tier 3 public employee's statutorily required pension contribution. Accordingly, the City has properly deducted 3% from the gross annual wages of its tier 3 police officers and firefighters as mandatory employee pension contributions.

I

### Tiers 1 and 2 and Section 480 (b)

An employee who joined a City retirement system[1] prior to July 1, 1973 is classified in tier 1, while an employee who joined from July 1, 1973 through July 26, 1976 is a tier 2 member (*see generally Civil Serv. Empls. Assn., Local 1000, AFSCME, AFL-CIO v Regan*, 71 NY2d 653 [1988]). While a public employee's pension rights and benefits generally vary based on tier membership, sometimes considerably, this is not true for tier 1 and 2 police officers and firefighters, whose pension prerogatives are virtually identical.

Upon retirement for service,[2] tier 1 and 2 police officers and firefighters are entitled to a retirement allowance consisting of an annuity based on "required annuity savings," and a pension funded by the City which, when added to the annuity, equals one half of the member's annual earnable compensation on the date of retirement for the minimum service period (*see* Administrative Code of City of NY §§ 13-255 [1]; 13-359 [a] [1]). The City actuary determines each police or fire member's individual rate of contribution to the annuity, based on age at date of appointment (*see id.* §§ 13-221, 13-321).

---

1. There are five City retirement systems, covering different categories of employees: PPF, FDPF, the Teachers' Retirement System (TRS), the Board of Education Retirement System (BERS) and the New York City Employees' Retirement System (NYCERS).

2. "Retirement for service" refers to retirement with full pension benefits after completing a required minimum number of years on the job, with no age restriction.

Starting in 1963, legislation authorized the City to assume a portion of police and fire employees' annuity contributions, thereby increasing their take-home pay (*see* L 1963, chs 221-224, subsequently codified at Administrative Code §§ 13-226, 13-326). The memorandum from the City's legislative representative explained that the "object" of the bills enacted by these chapters was "to authorize the Mayor to grant to members of the Police and Fire Department uniformed forces the benefits of pensions-providing-for-increased-take-home-pay *analogous to those provided for members of other retirement systems supported by the City*" (Mem of Legislative Representative of City of NY, 1963 McKinney's Session Laws of NY at 1949 [emphasis added]; *see e.g.* Administrative Code §§ 13-152 [authorizing pensions-for-increased-take-home-pay for other-than-authority members of NYCERS], 13-546 [authorizing pensions-for-increased-take-home-pay for members of TRS]). The ITHP benefit for police officers and firefighters was a temporary one, extended annually by legislation and executive order of the Mayor for successive one-year periods, ending on June 30, 1973, when it was caught up in the first round of statewide pension reform.

To deal with the "steeply mounting cost of public employee pensions," the legislature that year enacted chapters 382 and 383 (Governor's Approval Mem, Bill Jacket, L 1973, ch 383 at 2, 1973 McKinney's Session Laws of NY at 2343). Chapter 382 created tier 2 (Retirement and Social Security Law art 11) as a new pension category until June 30, 1976, when it was scheduled to lapse. Chapter 383 closed the public retirement systems existing as of June 30, 1973 (i.e., tier 1 systems) to new entrants, "extend[ed] temporary retirement benefits for *present members of such systems*" and created a legislative committee to study public pension reform and report to the governor and legislature (*id.* [emphasis added]).

With respect to temporary programs such as ITHP, section 2 of chapter 383 stated that

> "[a]ny program under which an employer in a public retirement system funded by the state or political subdivision thereof assumes all or part of the contribution which would be otherwise made by its employees toward retirement, which expires on or before August thirty-first, nineteen hundred seventy-three, shall be extended until August thirty-first, nineteen hundred seventy-three."

Later in 1973 the legislature amended this provision to extend these existing temporary programs through June 30, 1974 (*see* L 1973, ch 1046, § 66).

In 1974, the legislature enacted chapter 510, which followed up the previous year's pension reforms (*see* Governor's Program Bill Mem, Bill Jacket, L 1974, ch 510 at 2). Chapter 510 added a new article 13 to the Retirement and Social Security Law, which generally "extend[ed] all existing temporary benefits until June 30, 1976, the end of the moratorium on pension negotiations imposed by Article 12" (*id.* at 4).[3] New article 13 consisted of one section—section 480—broken into three subdivisions. Section 480 (b), substantively identical to section 2 of chapter 383 of the Laws of 1973,[4] provided that

> "[a]ny program under which an employer in a public retirement system funded by the state or one of its political subdivisions assumes all or part of the contribution which would otherwise be made by its employees toward retirement, which expires or terminates during nineteen hundred seventy-four, is hereby extended until July first, nineteen hundred seventy-six, notwithstanding the provisions of any other general, special or local law" (L 1974, ch 510, § 24).

The next year, as one of many measures taken in response to the City's fiscal crisis of the mid-1970s, the legislature amended section 480 (b) by adding the following clause at the end of it:

> "except that commencing with the payroll period the first day of which is nearest to January first, nineteen hundred seventy-six, and until July first, nineteen hundred seventy-six, the rate of such contribution assumed by *an employer in any of the public retirement systems funded and maintained by a city*, shall be one-half the rate of such contribution

---

**3.** Chapter 382 of the Laws of 1973 had added a new article 12 to the Retirement and Social Security Law, which prohibited further collective negotiations on retirement benefits, imposed (with minor exceptions) a three-year moratorium on the negotiation of new benefits and provided for negotiations thereafter to be conducted only on a coalition basis (*see* L 1973, ch 382, § 48; L 1973, ch 1046, § 56).

**4.** Subdivisions (a) (temporary rights, privileges or benefits scheduled to expire) and (c) (supplemental retirement allowances or supplemental pensions scheduled to expire), appear to derive from sections 1 and 3, respectively, of chapter 383 of the Laws of 1973.

assumed by such employer for the immediately preceding payroll period" (L 1975, ch 892, § 1 [emphasis added]).

This legislation halved the City's ITHP contribution rate for its tier 1 and 2 employees from 5% to 2.5%.

The rate returned to 5% for police officers and firefighters in 2000. That year, the City and the Municipal Labor Committee (MLC[5]) negotiated this increase as part of a package of pension enhancements, and the legislature amended section 480 (b) to implement their agreement (*see* L 2000, ch 373).[6]

The legislature amended section 480 (b) every year or two after its enactment in 1974 to extend its various expiration dates without interruption. As noted previously, though, the tier 5 pension reform legislation adopted in December 2009 made Retirement and Social Security Law § 480 (b) permanent by striking the extant expiration dates (*see* L 2009, ch 504, § 1, part A, § 5 [striking "and until July first, two thousand eleven" in paragraphs (i) (extending programs set to expire or terminate during 1974) and (ii) (requiring the City to assume a 5% contribution rate for police and fire members)]).

## Tiers 3 and 4 and Section 440 (c)

The pension reform initiatives begun in 1973 reached fruition in 1976, although somewhat later than planned. As we explained in *Regan*, the legislature had not settled on a "replacement

---

**5.** The MLC is an association of New York City municipal labor organizations, which collectively addresses matters of shared concern and advocates on issues of labor relations relevant to City workers.

**6.** Chapter 373 of the Laws of 2000 redesignated existing subdivision (b) of section 480 as a new paragraph (i) of that subdivision; added the phrase "except as provided in paragraph (ii) of this subdivision" at the end of new paragraph (i); and added a new paragraph (ii), which stated that

"[c]ommencing with the first payroll period the first day of which is subsequent to October first, two thousand and until July first, two thousand one, the rate of such contribution assumed by an employer in the New York city police pension fund and in the New York city fire department pension fund shall be equal to the rate of such contributions assumed by such employer for the payroll period preceding January first, nineteen hundred seventy-six" (Retirement and Social Security Law § 480 [b] [ii]).

As indicated earlier, the rate of contributions assumed by the City for "the payroll period preceding January first, nineteen hundred seventy-six" (i.e., prior to the effective date of chapter 892 of the Laws of 1975) was 5%. As discussed later, by 2000 tier 2 had long been closed to new entrants to the City's workforce other than police officers and firefighters.

system" by June 30, 1976, when tier 2 was scheduled to expire. Thus, the legislature

> "passed an extension of Tier II (L 1976, ch 491). On July 27, 1976, Governor Carey signed a comprehensive pension reform bill (Retirement and Social Security Law art 14 [L 1976, ch 890]), which provided that Tier III status be afforded all employees hired after July 1, 1976 (Retirement and Social Security Law § 500 [ch 890, § 1]), retroactively directed permanent closure to Tier II as of July 1, 1976 (ch 890, § 5), and established January 1, 1977 as the effective date of Tier III (L 1976, ch 890, § 9)" (*Regan*, 71 NY2d at 657).

To cover the gap between the end of tier 2 and the beginning of tier 3, the statute temporarily afforded tier 2 rights and benefits to employees entering into public service during that time period (*see* L 1976, ch 890, § 4; Retirement and Social Security Law § 451; *see also Regan, supra* [holding that this "tier downshift" did not violate article V, § 7 of the State constitution, but that application of tier 3's provisions prior to July 27, 1976, when the Governor approved chapter 890, would unconstitutionally diminish the rights of those covered by the tier 2 provisions then in existence]).

As a "basic element[ ]" of tier 3 (Retirement and Social Security Law art 14), employees contributed 3% of annual wages to their pensions (*id.* § 517 [a]). (*See also* Governor's Approval Mem, L 1976, chs 890, 891, 1976 McKinney's Session Laws of NY at 2455.) Tier 3 was a comprehensive retirement program designed to "provid[e] uniform benefits for all public employees and eliminat[e] the costly special treatment of selected groups . . . inherent in the previous program" (*see* Mem from Robert J. Morgado [Secretary to the Governor] to Judah Gribetz [Governor's Counsel], Bill Jacket, L 1976, ch 890). Article 14, however, temporarily retained tier 2 for police and fire members (*see* Retirement and Social Security Law § 500 [c]; *see also* Mem of Senator Richard E. Schermerhorn, 1981 Legis Ann at 352-353 [explaining how by operation of section 500 (c) police officers and firefighters enrolling in a public retirement system after July 1, 1976 were placed in tier 2]).

In 1981, the legislature amended Retirement and Social Security Law § 440 to add a new subdivision (c), which provided that

"[n]otwithstanding any other provision of law, the provisions and limitations of this article [11] shall apply, as may be appropriate, to all policemen and firemen who last joined a public retirement system of the state or a municipality thereof, on or after July first, nineteen hundred seventy-six, but prior to July first, nineteen hundred eighty-one" (Retirement and Social Security Law § 440 [c], as added by L 1981, ch 665, § 1).

Section 2 of the same chapter specified that, "[n]otwithstanding any other provision of law," police officers and firefighters who joined or rejoined a public retirement system on or after July 1, 1981, but prior to July 1, 1983, were subject to the provisions of article 11; i.e., were temporarily afforded tier 2 status.

In 1983 the legislature enacted tier 4 (Retirement and Social Security Law art 15), a "new statutory framework" for the provision of benefits to public employees previously covered by tier 3, which had proved over time to be difficult to administer and unsatisfactory in many respects. Tier 4 retained the "mandatory three percent employee contribution . . . to reduce the public employer cost of the new benefit" (Governor's Approval Mem, Bill Jacket, L 1983, ch 414, 1983 Legis Ann at 184). Tier 4 specifically excluded members of uniformed services, including City police officers and firefighters (*see* Retirement and Social Security Law § 600 [a] [3]).

The legislature in 1983 also amended Retirement and Social Security Law § 440 (c) to give permanent tier 2 status to police officers and firefighters who last joined a public retirement system between July 1, 1981 and June 30, 1983 (who had formerly had only temporary status) (*see* L 1983, ch 411, § 1; *see also* Mem No. 19-81 of Permanent Commn on Pub Empl Pension & Retirement Sys, Bill Jacket, L 1983, ch 411 at 14-15 [explaining history of and rationale for tier 2 status for police officers and firefighters]). This legislation afforded temporary tier 2 status to police officers and firefighters who joined or rejoined a public retirement system on or after July 1, 1983, but prior to July 1, 1985 (L 1983, ch 411, § 2).

In 1985, the legislature gave permanent tier 2 status to police officers and firefighters who last joined a public retirement system on or after July 1, 1976, but prior to June 30, 1987 (*see* L 1985, ch 281). Every two years from 1987 to 2007, the legislature enacted another two-year tier 2 extender. As

explained earlier, tier 2 was closed to virtually all[7] other categories of public sector employees hired after July 26, 1976.

On June 2, 2009, Governor Paterson vetoed the bill that would have afforded tier 2 coverage for police officers and firefighters appointed during the ensuing two years; i.e., from July 1, 2009 through June 30, 2011. The Governor commented that section 440 (c)'s sponsors in 1981 had portrayed tier 2 status for police officers and firefighters as a temporary measure (*see* Veto Message No. 5 of 2009). But, he continued, "[n]otwithstanding this statement, and the growing expense imposed on the State and localities by police officer and firefighter pension costs, this bill has been extended routinely since its initial enactment" (*id.*).

Remarking that "these are not routine times," the Governor referred to new tier 5 legislation that he had proposed, which would "mak[e] certain cost-saving changes for new entrants into the public pension system, while still providing a high level of benefits for public retirees" (*id.*). He added that he was "not willing to ignore the present reality, and simply re-enact the same provisions that have contributed to New York's financial straits, without accompanying reform" (*id.*). As a result of the Governor's veto, police officers and firefighters appointed on or after July 1, 2009 were no longer members of tier 2. And since tier 4 specifically excluded them from its coverage, they became members of tier 3.

In December 2009, the legislature created tier 5 (*see* L 2009, ch 504). Police officers and firefighters who became members of the New York State and Local Police and Fire Retirement System (PFRS) on or after January 1, 2010, were required to contribute 3% of their annual wages and made subject to tier 5's less generous overtime and vesting provisions. But the tier 5 legislation did not alter the tier 3 status of City police officers and firefighters appointed on or after July 1, 2009.[8]

---

**7.** In the City, for example, there was an exception for investigators employed in a District Attorney (DA)'s Office. These employees are members of NYCERS. DA investigators hired on or after July 1, 1976 through March 31, 2012 are tier 2 employees, entitled to ITHP (*see* Retirement and Social Security Law § 440 [e]). DA investigators hired on or after April 1, 2012 are "[i]nvestigator revised plan member[s]," subject to chapter 18 of the Laws of 2012 (tier 6) requirements (*see* Retirement and Social Security Law § 501 [27]; *see also* n 8, *infra*).

**8.** Under the most recent pension reform measures, enacted as chapter 18 of the Laws of 2012, City police officers and firefighters appointed on or after

## II

On July 6, 2010, Patrick Lynch, as President of the Patrolmen's Benevolent Association of the City of New York, Inc., on behalf of aggrieved police officers and the Association (collectively, PBA), filed a complaint against the City and the PPF. Roy T. Richter, as President of the Captains Endowment Association of the City of New York, Inc., on behalf of an aggrieved police surgeon and future adversely affected members (collectively, CEA), intervened in the action and interposed a complaint against the same parties on December 3, 2010. These complaints alleged five causes of action: that the City violated Retirement and Social Security Law § 480 (b) by failing to assume tier 3 police officers' pension contributions; that the PPF violated section 13-216 (b) of the City's Administrative Code by failing to adopt necessary resolutions with respect to tier 3 police officers' pension contributions; that the City breached its 2000 agreement with the MLC; that the City violated Labor Law § 193 by deducting 3% of tier 3 police officers' wages;[9] and that the City and the PPF unlawfully converted those wages. PBA and CEA sought declaratory relief, damages in the amount of the monies withheld from police officers' salaries as pension contributions, plus interest, and an injunction.

On March 30, 2011, the City and PPF moved to dismiss the complaints. On April 1, 2011, PBA and CEA separately moved for summary judgment and partial summary judgment as to liability, respectively. That same day, the assigned judge sua sponte converted the lawsuit to a CPLR article 78 proceeding and transferred the matter for reassignment.[10]

---

April 1, 2012 are classified as tier 3 "revised plan members" (tier 6) (see Retirement and Social Security Law § 501 [26]). They are therefore subject to the changes to article 14 (tier 3) made by chapter 18, which established tier 6.

9. Section 193 prohibits an employer from making "any deduction from the wages of an employee" unless permitted by law or authorized by the employee for certain payments made for the employee's benefit (see Labor Law § 193 [1] [a], [b]).

10. On September 6, 2011, the newly assigned judge so-ordered a stipulation specifying that the parties did not object to orders granting the Uniformed Fire Officers Association (UFOA) intervenor status, and directing that the Association be added as a party plaintiff by amending the caption of CEA's complaint. Alexander Hagan, as President of UFOA, on behalf of an aggrieved medical officer and future adversely affected members (hereafter collectively, UFOA), filed a verified petition on September 1, 2011, which named the FDPF as an additional respondent. By letter dated September 15, 2011, UFOA joined in the motions for summary judgment filed by PBA and CEA.

By decision and order dated January 20, 2012, Supreme Court dismissed the second (violation of Administrative Code), third (breach of contract), fourth (violation of Labor Law § 193) and fifth (conversion) causes of action, and severed and dismissed the petition as to PPF and FDPF (2012 NY Slip Op 33199[U] [Sup Ct, NY County 2012]). With respect to the first cause of action, the court declared that the City had

> "violated and continues to violate Retirement and Social Security Law § 480 (b) (i) and (ii) by failing to contribute to members of the [PPF and FDPF] who are in Tier III of the City's pension system the amounts required by § 480 (b) (ii), to wit, amounts 'equal to the rate of such contributions assumed by such employer for the payroll period preceding [January 1, 1976].' " (2012 NY Slip Op 33199[U], *9-10.)

Supreme Court rejected the City's argument that Retirement and Social Security Law § 480 (b) was only applicable to tier 1 and 2 police officers and firefighters because it only encompassed programs in place during 1974 for members in tiers 1 and 2. The judge concluded that the relevant Code provisions (i.e., Administrative Code §§ 13-226, 13-326) made ITHP available to "members" of the pension funds, without reference to tiers, and "[i]ndisputably," these provisions were intended to include future, as well as current, members. (2012 NY Slip Op 33199[U], *5.)

Further, Supreme Court interpreted the legislature's enactment of the tier 5 pension reform legislation, insofar as section 480 (b) was made permanent, as "mak[ing] the provisions of that statute applicable to City employees joining the retirement system on or after January 1, 2010," by which time "there had been police officers and fire fighters . . . in Tier III of their respective pension funds for more than five months." (2012 NY Slip Op 33199[U], *5-6.)

Supreme Court also discounted the City's argument that the ITHP program was inconsistent with the statutory requirement for tier 3 employees to contribute 3% of their wages annually toward their pension benefits. The judge acknowledged that ITHP would "reduce their contributions to zero." (2012 NY Slip Op 33199[U], *6.) She noted, however, that the contribution rates for police and fire members appointed before July 1, 2009 varied from 8.65% for an individual entering the uniformed

workforce at age 16 to 4.30% for someone hired at age 43. As a result, she perceived "no inconsistency in [tier 3] members paying nothing[ ] [because] Tier I and Tier II members whose contribution rates are 5% or less of their salaries also pay nothing, although they are required to pay at the rate set by the actuary of the City." (2012 NY Slip Op 33199[U], *7.)

Supreme Court next concluded that the second cause of action lacked merit because the pension funds had "no authority to determine whether, or to what extent, their members or the City is responsible for contributing to them." (2012 NY Slip Op 33199[U], *8.) With respect to the third cause of action, the judge observed that when the parties entered into the MLC agreement in 2000, "it was hardly in [their] contemplation . . . that, nine years later, newly hired police officers and fire fighters would no longer be placed in Tier II of their respective pension systems." (*Id*.) Finally, Supreme Court concluded that neither the fourth nor the fifth cause of action possessed any "independent vitality" since both "rest[ed] entirely upon the allegations of the first cause of action." (2012 NY Slip Op 33199[U], *9.) By order entered March 16, 2012, the judge granted the parties permission to appeal. The City sought to have Supreme Court's order reversed and the petition dismissed; PBA, CEA and UFOA (collectively, the unions) cross-appealed the dismissal of their second, third and fifth causes of action.

In a decision dated May 16, 2013, the Appellate Division modified Supreme Court's order, with one Justice dissenting (108 AD3d 94 [1st Dept 2013]). The court held that "the [City's] decision to not apply an [ITHP] benefit to police officers and firefighters placed into tier 3 of the retirement system after July 1, 2009, and to continue deducting 3% of their wages towards their retirement benefits, violate[d Retirement and Social Security Law § 480 (b)]" (*id*. at 96). The Appellate Division also held that the unions had "sufficiently stated a cause of action for common-law conversion of the deducted wages" (*id*.). Accordingly, the court denied the City's motion to dismiss the fifth cause of action and granted the plaintiffs' motion for summary judgment on the issue of the City's liability for conversion.

The Appellate Division considered it significant that ITHP, although initially implemented as part of the City's Administrative Code, was "recodified" as Retirement and Social Security Law § 480, and that, unlike the Code, section 480 "makes no reference to any 'annuity contribution' " and "[b]y its own language, . . . is not restricted to tier 1 or 2, or to annuity

contributions" (*id*. at 99). This caused the court to reason that "the section 480 recodification was intended to extend ITHP to any current pension tier," a conclusion "buttressed by the fact that, rather than being included in Retirement and Social Security Law article 11, governing tier 2, the statute was enacted as the sole occupant of its own freestanding article, article 13" (*id*. at 99-100).

The Appellate Division also noted that it was not "unprecedented" for members to "pay nothing towards their retirement" (*id*. at 100). And observing that tier 3's benefits are generally inferior to those of tiers 1 and 2, the court suggested it was "not unthinkable that the legislature might wish to soften the blow for tier 3 police officers by continuing to extend them the benefit of ITHP contributions" (*id*.).

The Appellate Division summed up by reiterating that

> "the plain language of section 480 and its placement in its own freestanding article are indicative of a legislative intent that ITHP contributions continue to apply to police officers, regardless of their tier. Morever, despite the grave financial situation facing the City, the legislature, in creating tier 3, modified many benefits available to public sector employees in that tier, but chose not to exclude or diminish ITHP" (*id*.).

As an example of this last point, the court pointed out that "the [legislature] expressly mention[s] ITHP in section 508-a (a) [of the Retirement and Social Security Law] death benefits" (*id*.).

The dissenting Justice reasoned that the Administrative Code's "operative language creating the ITHP benefit (a reduction of annuity contributions) cannot be applied to tier 3 members, whose retirement plan lacks any annuity component" (*see* 108 AD3d at 102 [Friedman, J., dissenting]). He opined that Retirement and Social Security Law § 480 (b) did not create an ITHP program, but rather extended the Administrative Code's preexisting program for tier 1 and 2 police officers and firefighters.

On August 27, 2013, the Appellate Division granted the City's motion for permission to appeal (2013 NY Slip Op 83448[U] [2013]), asking us whether its order was properly made. We now answer that question in the negative.

## III

The unions argue that the plain language of Retirement and Social Security Law § 480 (b) requires the City to make a 5% ITHP contribution for every tier 3 police officer and firefighter. Several additional factors support this conclusion, the unions claim: specifically, when enacting tier 3 in 1976, the legislature did not exclude or otherwise limit ITHP although that new tier afforded reduced benefits to public sector employees; the legislature made section 480 (b) permanent mere months after Governor Paterson's veto, without in any way confining its application to a particular tier or tiers; and the legislature in 1998 added new section 508-a to the Retirement and Social Security Law, which expressly references ITHP in connection with death benefits for survivors of certain tier 3 employees.

The City counters that section 480 (b) can only be understood in the context of New York State's tiered pension systems, and that ITHP has always only been provided to City and state or local employees in tiers 1 and 2. Further, the City argues, by making ITHP permanent the legislature did not expand this benefit's coverage, it simply closed out or froze a program for which new employees were no longer eligible; and that the reference to ITHP in Retirement and Social Security Law § 508-a, which was added to tier 3 some 20 years after tier 2 had essentially been closed to new entrants except police and fire members, did not afford ITHP to tier 3 employees, or demonstrate a legislative perception that ITHP was available to tier 3 employees.

Section 480 (b) extends "[a]ny program" otherwise set to expire or terminate in 1974 "under which an employer in a public retirement system funded by the state or one of its political subdivisions assumes all or part of the contribution which would otherwise be made by its employees toward retirement." Granted, section 480 (b) does not identify, and therefore does not on its face limit, the tier of the members of the state and local public retirement systems who benefit from the temporary programs that it encompasses. But as the Governor's Approval Memorandum for section 480 (b)'s predecessor stated, this provision was meant to "extend[ ] temporary retirement benefits for *present members*" of the programs to which it referred (*see* Governor's Approval Mem, Bill Jacket, L 1973, ch 383 at 2, 1973 McKinney's Session Laws of NY at 2343). And from 1974 through June 30, 2009, the "present members" of the City's

ITHP programs for police officers (Administrative Code § 13-226) and firefighters (*id.* § 13-326) were tier 1 and 2 employees.

When enacted as article 13 of the Retirement and Social Security Law in 1974, section 480 (b) did not simply "recodify" sections 13-226 and 13-326 of the City's Administrative Code for the benefit of police officers and firefighters. By its plain terms, section 480 (b) extended "[a]ny" program in the City and throughout the state which required a public employer to make pension contributions on behalf of its employees. Although the unions and the City dispute exactly how many of these temporary "programs" or "provisions" for temporary benefits existed in 1974, the fiscal note[11] for chapter 510 of the Laws of 1974, which enacted section 480 (b), includes a laundry list of provisions. One discrete section of the fiscal note refers to and estimates the costs of a two-year extension of the City's ITHP "provisions." These "provisions" may be considered to have embraced five "programs," since employees in all five of the City's retirement systems received ITHP at the time.

Next, the legislature did not need to *exclude* or otherwise limit ITHP when it enacted tier 3 in 1976 in order to confine ITHP to tier 1 and 2 police and fire members, as the unions argue. In 1976, only tier 1 and 2 employees were entitled to ITHP; therefore, the legislature would have been required to *include* this benefit for tier 3 employees in order to make it available to them. Instead, of course, the tier 3 legislation required tier 3 employees to contribute 3% of annual wages to their pensions. At the same time, the legislature *continued* police and fire members in tier 2, while periodically extending section 480 (b) to authorize ITHP for new entrants into PPF and FDPF.

And as the City points out, eventually making ITHP permanent for all tier 1 and 2 police and fire members did not somehow silently expand ITHP to cover the City's current and future tier 3 police officers and firefighters. The record does not disclose how many, if any, police officers were hired from July 1, 2009 until early December of that year, when the legislature

---

11. Fiscal notes for bills that affect the retirement system are required by section 50 of the Legislative Law, which reads as follows:

> "[a] bill which enacts or amends any provision of law relating to a retirement system or plan of the state of New York or of any of its political subdivisions shall contain a fiscal note stating the estimated annual cost to the employer affected and the source of such estimate" (Legislative Law § 50).

considered and passed the bill that became the tier 5 pension reform legislation. (The first class of new firefighters was not appointed until after this litigation began.) But the legislature presumably knew that the City took the position that tier 3 police officers and firefighters were not entitled to ITHP. Yet nothing in the statute's legislative history or the bill's extensive fiscal note hints that the legislature aimed to countermand the City and extend ITHP to tier 3 police officers and firefighters.

The legislative history that exists reflects a common understanding that ITHP is a benefit available only to tier 1 and 2 employees. As an example, the City notes, the sponsor's memorandum for the two-year extension of section 480 (b) enacted in 1995 explicitly states that this provision continued "all temporary rights, privileges and retirement benefits conferred by any general, special or local law *with respect to individuals who joined a public retirement system of the state before July 1, 1976*"—i.e., tier 1 and 2 employees (*see* Sponsor's Mem, L 1995, ch 138, 1995 Legis Ann at 115 [emphasis added]; *see also* Div of Budget Mem, Bill Jacket, L 2007, ch 27 at 7 [noting that the pending two-year extension of section 480 (b) covered "all temporary benefits . . . provided to members of a public retirement system or pension plan funded by the State or one of its political subdivisions, *with the exception of Articles 14 (tier 3), 15 (tier 4) and 18 of the RSSL*" (emphasis added)]).

In a related vein, the legislature periodically amends the City's Administrative Code with respect to the interest rate to be used for calculating the City's contribution rate to its retirement systems and, among other things, the additional interest to be credited by the City to the reserve-for-increased-take-home-pay of each member entitled to ITHP. Section 13-638.2 (g) (3) of the Code, added by the legislature in 1990 (*see* L 1990, ch 878), states that

> "[a]dditional interest shall not be considered in determining rates of contribution of members. *Nothing contained in this subdivision [g] shall be construed as applicable to any member of a retirement system who is subject to the provisions of article fourteen [tier 3] of the retirement and social security law or article fifteen [tier 4] of such law*" (emphasis added).

Concomitantly, the introducer's memorandum in support of extensions to continue or adjust these interest rates has

routinely stated that "[t]he bill also would extend . . . the amount of interest to be credited on . . . increased-take-home-pay reserves *of Tier I and II members of those retirement systems*" (*see* Senate Introducer Mem in Support, Bill Jacket, L 2004, ch 133 at 4 [emphasis added]; *see also* Senate Introducer Mem in Support, Bill Jacket, L 2005, ch 133 at 3; Assembly Introducer Mem in Support, Bill Jacket, L 2009, ch 211 at 5; Budget Report on Bills, Bill Jacket, L 2000, ch 85 at 3 [noting that the bill would "(r)etain the current 8.25 percent interest rate for purposes of crediting interest on Tier I and Tier II member contributions and increased-take-home-pay reserves"]).

Further, Retirement and Social Security Law § 508-a does not suggest that tier 3 employees are entitled to ITHP. This provision, the only reference in article 14 (tier 3) to ITHP, affords the survivors of certain tier 3 employees with "[a] death benefit plus the reserve-for-increased-take-home-pay, *if any*" (Retirement and Social Security Law § 508-a [a]). As the City points out, a tier 3 employee who embarked upon City service during the gap period between tiers 2 and 3 (i.e., any time on or after July 27, 1976 and through December 31, 1976) would have temporarily been a tier 2 employee, entitled to ITHP for the brief period of time between date-of-appointment and January 1, 1977 (*see generally* discussion of *Regan* at 764-765, *supra*). Thus, section 508-a fails to show that the legislature "never intended to exclude ITHP from tier 3" (108 AD3d at 100). Indeed, if that were the case, the qualifier "if any" would seem unnecessary.

Finally, our interpretation of section 480 (b) is consistent with the overall design of New York's tiered public employee pension systems and the series of pension reforms implemented to reduce public employers' pension costs. First, while not all tier 1 or 2 City police officers or firefighters contribute to their pensions because of the 5% ITHP, those with the higher actuarially determined contribution rates—i.e., those who entered police and fire service at a younger age—certainly do. But under the unions' view of section 480 (b), *no* tier 3 police officer or firefighter would make *any* pension contribution because the City's 5% ITHP contribution rate is obviously higher than the 3% contribution rate for tier 3 employees. Put slightly differently, all police and fire members in the higher tier 3 would enjoy a major benefit (a noncontributory pension) available only to some police and fire members in the lower tier 2. This would be a striking exception to the way public employee pensions in New York typically operate.

Second, Governor Paterson vetoed the extension of section 440 (c) in June 2009 explicitly so as to lessen the financial burden on state and local governments of pension costs for police officers and firefighters, and increased employee contributions are a major way for public employers who offer defined-benefit pension plans to reduce costs. It is difficult to believe that in December 2009 the Governor signed pension reform legislation that substantially—and silently—undid his six-months-earlier veto by creating a noncontributory pension for the City's tier 3 police and fire members, while at the same time tier 3 and 5 police officers and firefighters elsewhere in the state were required to contribute 3% of their annual wages to the retirement system.

Accordingly, the order of the Appellate Division should be reversed, with costs; judgment granted declaring in accordance with this opinion; the fifth cause of action dismissed; and the certified question answered in the negative.

Chief Judge LIPPMAN and Judges GRAFFEO, SMITH, PIGOTT and RIVERA concur; Judge ABDUS-SALAAM taking no part.

Order reversed, with costs, the fifth cause of action dismissed, judgment granted declaring in accordance with the opinion herein, and certified question answered in the negative.